## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**CHRISTINA DIIORIO-STERLING, AS NOMINATED PERSONAL REPRESENTATIVE OF THE ESTATE OF SCOTT R. STERLING, AND AS WIDOW AND SOLE BENEFICIARY OF THE ESTATE OF SCOTT R. STERLING,**

**Plaintiff,**

**v.**

**CAPSTONE MANAGEMENT, LLC; ROCHESTER PRECISION OPTICS, LLC; ONPOINT SYSTEMS, LLC; and KENNETH SOLINSKY,**

**Defendants.**

Civil Action No. _____

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

Plaintiff Christina DiIorio-Sterling prosecutes this action on behalf of the Estate of Scott R. Sterling, and on her own behalf as his widow and the sole beneficiary of his estate.

Scott R. Sterling ("Mr. Sterling") was a decorated veteran of the United States Armed Services. When he returned from military duty, he met Kenneth Solinsky ("Mr. Solinsky"), an entrepreneur within the defense industry. Mr. Sterling was recruited to work for Mr. Solinsky's company and did so to great effect. When he sold his company, Mr. Solinsky told Mr. Sterling that he had "plans" for him and that he intended to bring Mr. Sterling back into his family business, run through Capstone Management LLC ("Capstone"). Mr. Solinsky and Mr. Sterling would work together again, Mr. Solinsky said, as Mr. Solinsky intended for his family business to launch another company in the defense industry.

Mr. Solinsky was not just talk.  Less than two years after the two men had gone their separate ways, with Mr. Sterling successfully moving on to roles with another defense industry business, Mr. Solinsky proposed a new venture to Mr. Sterling.  He asked Mr. Sterling to leave his employer and come back to work for Mr. Solinsky.  Mr. Solinsky said that they would launch a defense business and woo those who had worked for them previously to join them.  When Mr. Sterling asked if this was appropriate, given the agreements made in connection with the sale of the company, Mr. Solinsky brushed aside his question.  He pledged that Mr. Sterling would have a stake in the new entity and would be entitled to long term benefits.  With these incentives, Mr. Sterling gave notice to his employer and readied to join Capstone in creating this new venture.

But then, three weeks before his start date, he received another call from Mr. Solinsky, who told him that the defense business was a no-go at this time, confirming Mr. Sterling's earlier expressed concerns.  Mr. Solinsky said he had another idea, however: he saw an opportunity to create a new product, a different kind of electronic fence for dogs.  He urged Mr. Sterling, a talented and hard-working veteran, to join him and lead this venture, as part of Mr. Solinsky's portfolio of family businesses.  After it launched, Mr. Solinsky promised, he would involve Mr. Sterling again in a defense industry endeavor and Mr. Sterling could reap the benefits of the start up's success in terms of significant long-term bonuses.

Mr. Sterling agreed and did his part.  Within three years, he launched SpotOn Fence and positioned it to garner public attention through industry awards.  Mr. Solinsky would trumpet the achievements of Mr. Sterling's team.

But Mr. Solinsky failed on his end.  The breach began shortly after Mr. Sterling notified Mr. Solinsky, in December of 2018, that he had stage 4 colorectal cancer.  Mr. Sterling remained committed to his work, showing up for his job every day, and working remotely only twice a

month while he received chemotherapy infusions.  But Mr. Solinsky began to distance himself from the colleague he had so valued to that point.  Then, in the summer of 2019, when Mr. Sterling told Mr. Solinsky that he would need time some real time off – for the first time – for surgery to remove the primary tumor and that he may appear ill for a while, Mr. Solinsky decided apparently that this was not the look he wanted nor did he want to have someone in his companies whom he might have to carry.

Three weeks before the scheduled surgery, he called Mr. Sterling in and fired him, effective immediately.  Moreover, Mr. Solinsky did not do as he had initially promised, *i.e.*, to offer Mr. Sterling a position in another venture, although in fact Mr. Solinsky started a defense industry venture shortly after he fired Mr. Sterling.  The damage done to Mr. Sterling in the final years of his life from Mr. Solinsky's cruel acts was substantial.  It was emotional and financial. Mr. Sterling passed away on April 12, 2021.  His wife now brings this action, sounding in contract and under federal law, on behalf of her late husband's estate and on her own behalf as his widow and the sole beneficiary of his estate.

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1332.

2. The jurisdictional prerequisites of this Complaint under Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* have been met.

## THE PARTIES

3. Plaintiff Christina DiIorio-Sterling is the nominated personal representative of the Estate of Scott R. Sterling, pending in the Suffolk Division, Probate and Family Court Department of the Trial Court of Massachusetts.  She is his widow, and sole beneficiary of his

estate.  She resides at 21 Wormwood Street, Unit 501, Boston, Massachusetts, the home she

made with Mr. Sterling until he passed away on April 12, 2021.

      4.      On information and belief, Defendant Kenneth Solinsky resides at 59 Rolling

Woods Drive, Bedford, New Hampshire 03110.  Along with his spouse, Grace Solinsky, Mr.

Solinsky co-owns and controls Capstone, through which he in turn operates and manages an

integrated enterprise involving Capstone, OnPoint Systems, LLC, and Rochester Precision

Optics, LLC, all ventures within Capstone's portfolio of ventures.

      5.      Defendant Capstone Management LLC is a New Hampshire limited liability

company with its principal place of business located at 7 Perimeter Road, Manchester, NH

03103.  Pursuant to its Certificate of Formation, on file with the New Hampshire Secretary of

State's office, the purpose of Capstone is "the operation and management of an office for family-

controlled businesses."  On information and belief, the family control referenced in the

Certification is the control of the Solinsky family, and it is Mr. Solinsky who co-owns, manages

and/or operates the Defendant businesses within Capstone's portfolio.  Also, on information and

belief, these businesses form an integrated or joint enterprise under common ownership,

management, and control.

      6.      Defendant OnPoint Systems, LLC ("OnPoint"), is a New Hampshire limited

liability company with its principal place of business at 7 Perimeter Road, Manchester, NH

03103.  As listed with the New Hampshire Secretary of State, OnPoint is a company owned and

controlled by Capstone.  The filing lists OnPoint's business email address as

accounting@capstone-mgt.com and directs all corporate notifications likewise to be sent to the

same Capstone Management email.  Rebecca Hunzeker, on information and belief an employee

of Capstone Management, is listed as the registered agent for OnPoint, as she is for defendants

Capstone and Rochester Precision Optics, LLC ("RPO"). Also, on information and belief, during times relevant to this action, Capstone provided OnPoint financial and operational oversight and assistance, while RPO, another organization within Capstone's portfolio, provided human resources and manufacturing support. Further, on information and belief, during times relevant, through Capstone, Mr. Solinsky co-owned OnPoint with his wife and he managed the business.

7.      Defendant Rochester Precision Optics, LLC is a Capstone limited liability company registered in New Hampshire. Its principal place of business is 7 Perimeter Road, Manchester, New Hampshire 03103. During times relevant, RPO provided human resources support and product manufacturing support for OnPoint Systems. On information and belief, through Capstone, Mr. Solinsky co-owns the business with his wife and manages the business.

## FACTS

8.      Mr. Sterling began his career serving in the United States Army as an infantryman with the 1st Battalion-75th Ranger Regiment, the 75th Ranger Regimental Reconnaissance Detachment and a Special Mission Unit in the United States Army Special Operations Command (USASOC), 1st SFOD Delta Force. He was a 100% disabled American veteran, although his disability was not visible.

9.      When Mr. Sterling left the military, in 2002, he was recruited to join Insight Technology, Inc. ("Insight"), in a business development role. Mr. Solinsky was the founder and President of Insight. Mr. Sterling began as a manager of business development at Insight and was steadily promoted over time to Vice President.

10.     During his employment with Insight, Mr. Sterling never disclosed his disability.

11.     When Mr. Sterling joined Insight, he was excited to move into an industry that he knew meant so much to the nation's armed forces: Insight had in fact provided the night vision and targeting solutions to the 1st SFOD Delta Force , the unit to which Mr. Sterling had been assigned in the Army Special Operations Command.

12.     In 2010, L- 3 Communications ("L-3") acquired Insight. After the sale, Mr. Solinsky became President of L-3's newly created Warrior Systems Sector, reporting to others within L-3.

13.     In or around this same time, Mr. Solinsky promoted Mr. Sterling to the role of Vice President of business development for L-3 Warrior Systems-Insight.  In this role, Mr. Sterling continued working closely with Mr. Solinsky.

14.     Repeatedly over the time Mr. Sterling worked with Mr. Solinsky as part of this endeavor, Mr. Solinsky expressed confidence in Mr. Sterling's abilities and Mr. Solinsky's intention to work with Mr. Sterling as Mr. Solinsky pursued other corporate interests.

15.     In 2013, when Mr. Solinsky left L-3, he specifically told Mr. Sterling that the two should remain in touch because Mr. Solinsky had "something planned" for him in terms of future business endeavors.

16.     In 2014, and given his track record and reputation, Mr. Sterling was recruited by Gentex Corporation ("Gentex") to serve as a Director of Business Development, a role that would have him continuing to work in the defense field.  He took the position and, in light of his work, he was promoted to Vice President of New Concept Development at Gentex within six months of joining the company.

17.     Shortly after Mr. Sterling had joined Gentex, in the fall of 2014, Mr. Solinsky invited him to join him on a trip to attend a boat show in Florida, at which time Mr. Solinsky

initiated discussions with Mr. Sterling about Mr. Solinsky's plans for starting a new business venture in the defense industry.  He asked Mr. Sterling to join him, with the plan of recruiting former colleagues away from Mr. Solinsky's former company and the division Mr. Solinsky had led after he had sold it to L-3: L-3 Warrior Systems-Insight.

18.     When Mr. Sterling asked if such poaching of employees would be permissible, Mr. Solinsky indicated that there would be no impediment to his plan.

19.     Over time, the two continued to speak about this potential venture.  Then, in the spring of 2015, Mr. Solinsky asked Mr. Sterling to join him as the President of a startup which Mr. Solinsky was planning to establish as a corporate subsidiary of Capstone.  Mr. Solinsky promised Mr. Sterling a substantial equity stake in the new venture.

20.     As for the business focus of the new entity, Mr. Solinsky spoke of developing a new entity focused on defense technology and products.  Clearly this venture would seek to compete with L-3 Warrior Systems-Insight and they anticipated drawing upon their former colleagues and their expertise developed at Insight and L-3 Warrior Systems.

21.     Mr. Sterling had loved his work at Insight and, based upon Mr. Solinsky's assurances that the development of this entity was consistent with Mr. Solinsky's agreements upon exiting L-3, and Mr. Solinsky's assurances that Mr. Sterling would receive an equity interest in the new venture, Mr. Sterling gave his notice at Gentex and accepted the position.  He was excited to get started.

22.     After Mr. Sterling had given notice at Gentex and as he was preparing to start with Capstone and Mr. Solinsky, Mr. Sterling received a call: Mr. Solinsky told him that – in fact – Mr. Solinsky could not enter the defense industry at that time.

23.     The conversation occurred three weeks before Mr. Sterling was to start in his new position at the helm of one of Capstone's start-up ventures.

24.     Mr. Solinsky told Mr. Sterling that he anticipated that the two of them would work at Capstone together across various corporate endeavors within Capstone's portfolio in any event.  He asked Mr. Sterling to be flexible and willing to work in another business that Mr. Solinsky wanted to start up in a consumer space, developing a dog containment and tracking system.

25.     Mr. Sterling initially balked.  He was a specialist in the defense industry and consumer products in this area were not what he knew.

26.     In order to convince him to remain with him and within the Capstone portfolio of companies, Mr. Solinsky explained – on more than one occasion – that Mr. Solinsky wanted Mr. Sterling to launch this new product and then – when they could – they would start up the originally envisioned company within Mr. Solinsky's portfolio, developing products for military use.

27.     Also to convince Mr. Sterling to remain with Capstone, Mr. Solinsky assured him that he would be well-compensated upon the launch of the product with a stake in its success over time.  Mr. Solinsky pledged that there would be a significant pay-out down the road if Mr. Sterling undertook the position.

28.     On April 16, 2015, Mr. Solinsky sent Mr. Sterling an offer letter which laid out a bonus program.  When Mr. Sterling asked for clarity regarding the program, he was assured that the bonus program set out in the offer letter was intended to assure that Mr. Sterling and the engineer lead of the SpotOn Fence would receive as bonuses 10% of the profit of the company to be divided between them and upon a sale of the business.

29.     Mr. Solinsky tendered this offer well aware that the consumer electronics field was an area that was new to him and to Mr. Sterling.

30.     Trusting Mr. Solinsky's representations, as he considered him a long-time friend, mentor, and father-figure, Mr. Sterling decided to embrace the challenge and was excited to join with Mr. Solinsky and Sung Vivathana to found OnPoint and grow it as part of Solinsky's portfolio of companies.

31.     From the May of 2015 to September 3, 2019, Mr. Sterling served as President of OnPoint, where he was responsible for the overall design, development, and introduction of the SpotOn Virtual Smart Fence ("OnPoint product").

32.     In exchange for the commitment to this work and in recognition that start-ups take time and significant early effort, Mr. Solinsky guaranteed Mr. Sterling's salary through May of 2018 and provided a bonus program which would be realized when the company saw positive cash flow.  The compensation from that bonus program promised to be significant.  At a later date, Mr. Solinsky and Mr. Sterling began discussing the potential for the OnPoint product to be acquired by another company and various exit strategies and they mapped out likely profit scenarios.

33.     With the promise of significant bonuses and a pay-out, as well as the promise that Mr. Sterling would be moved over to a defense industry effort upon any exit from the venture he was to lead, from 2015 through 2018, Mr. Sterling led the effort to build the OnPoint product, test it and bring it to market.  As with all start-ups, the effort took time, investment, and the intense commitment of the team.  He reported directly to Mr. Solinsky in this work.

34.     When the team ran into challenges, Mr. Solinsky repeatedly expressed his trust in Mr. Sterling's leadership and in the group assembled.  Re-affirming his commitment to Mr.

Sterling and his plan to deploy him in corporate ventures within the Capstone portfolio, Mr.

Solinsky repeatedly said to Mr. Sterling: "Keep fighting … if this doesn't work, there are other

things we can do."

35.     Mr. Sterling trusted Mr. Solinsky when he spoke and Mr. Sterling relied upon Mr.

Solinsky's representations as he continued to pour his effort into OnPoint, although he did have

concerns about his attitude towards disabled people.

36.     At some point in or around 2018, Mr. Solinsky was making fun of individuals

with Post Traumatic Stress Disorder ("PTSD") based on his experiences in the military.  It was at

this moment that Mr. Sterling, for the first time, felt obliged to let Mr. Solinsky know that he had

suffered from PTSD based on his years in the service.  Mr. Solinsky expressed surprise, because

Mr. Sterling was a physically very fit person with a positive attitude at work.  Mr. Sterling did

not meet Mr. Solinsky's stereotyped and demeaning view of how someone with PTSD behaved.

37.     In the fall of 2018, Christina Sterling, Mr. Sterling's wife and plaintiff in this

action, was diagnosed was a rare form of lymphoma.  Mr. Sterling informed Mr. Solinsky of this

news.  But, despite the personal strain Mr. Sterling felt, it did not alter his commitment to his

work.  Mr. Sterling reported to work daily.

38.     Then, in December of 2018, Mr. Sterling himself received devastating news: He

too had cancer, having been diagnosed with stage 4 colorectal cancer.

39.     When he received the diagnosis, Mr. Sterling called his second in command to let

him know that he would be out for a couple of days as testing continued.

40.     Four days later, once the diagnosis had been confirmed, Mr. Sterling spoke with

Mr. Solinsky.  Mr. Sterling was clear with Mr. Solinsky: he expected to kick this disease back

and intended to stay fully engaged at work through whatever treatment he faced.  To be sure, Mr. Solinsky expressed sympathy with the situation.

41.     Within days of this meeting, after his hospital tests had concluded, Mr. Sterling returned to work full-time.  He was never out for any extended period of time from that time throughout 2019.

42.     Preparing a new product to go to market involves healthy strategic discussions and debates.  While that occurred at Capstone, at no time prior to December of 2018 had Mr. Solinsky *ever suggested* that he was disappointed in Mr. Sterling's performance or that he needed to change course.

43.     Certainly, from the end of 2018 forward, Mr. Sterling's presence at work was slightly altered: he was on chemotherapy and, although his strong physical presence did not change, the team could hear his chemo-pump in meetings that would occur for two days following infusions.  Twice a month, Mr. Sterling worked remotely from an infusion chair, while receiving chemotherapy.  Mr. Sterling did not need to and did not take any significant time off to attend to matters related to his health.  He pressed forward.

44.     In fact, the pace of the work did not slow down and the prospects for the OnPoint product were extraordinarily positive.

45.     Early 2019 was an exciting and busy time for the new business, as they prepared to get their product to market.  Mr. Sterling remained entirely engaged, and his illness did not slow down the progress of the development and marketing of the OnPoint product.  While Mr. Solinsky seemed to distance himself from Mr. Sterling during this time, Mr. Sterling hoped that this change of attitude was not based upon his disclosed medical condition.  He pressed on.

46.     By the spring of 2019, the company and its innovative product were garnering public attention. And, in the summer of 2019, sales were beginning to take off and public attention to the OnPoint product was moving in exciting directions.

47.     At no time ever prior to the summer of 2019 had Mr. Solinsky *ever* suggested to Mr. Sterling that he was considering a change in leadership at OnPoint or that Mr. Solinsky was considering reneging on his promise to retain Mr. Sterling within the Capstone portfolio of companies.

48.     In this context, two things happened.

49.     In or around June of 2019, Mr. Sterling learned that, to attack his cancer, he would need surgery.  It would likely be in the fall, just as OnPoint's marketing was ramping up.

50.     Mr. Sterling informed Mr. Solinsky of this development.  In several conversations, Mr. Sterling expressed his own disappointment that he might appear sick right as the venture was ramping up our sales efforts and when interviews would need to be done to market the product at its formal launch.  Mr. Solinsky said nothing in response.  On information and belief, Mr. Solinsky had started to view Mr. Sterling through a newly biased and stereotyped lens, as a disabled employee whom he did not want to carry.

51.     Around early of August of 2019, Mr. Solinsky spoke to Mr. Sterling about adding additional staff and increasing the salary of the Director of Engineering, in recognition of the group's efforts and accomplishments.  He also spoke with him about providing raises and bonuses across the board.  But he did not offer Mr. Sterling a similar increase in compensation.

52.     In August of 2019, Mr. Sterling's surgery was scheduled for September 20, 2019. It was clear that, in advance of it, Mr. Sterling would need some time away from the office to prepare for the surgery and that he would need time afterwards to recover.  This was to be the

first significant time away from the job Mr. Sterling was obliged to request since his wife's

diagnosis and his own.

53.     It was not to be indulged.

54.      On September 3, 2019, Mr. Sterling was called into a meeting with Mr. Solinsky

who terminated Mr. Sterling's employment effective immediately.  Mr. Sterling was not offered

real or legitimate reasons for the action nor was he offered another position within the Capstone

portfolio, as previously pledged.

55.     On information and belief, Mr. Solinsky had no legitimate reason for terminating

Mr. Sterling's employment and his affiliation not only with OnPoint, but also with Capstone.  On

information and belief, what drove Mr. Solinsky's decision was his bias against Mr. Sterling

based on his status and his stereotyped perception of how someone fighting cancer would

perform at the helm of any of the organizations within the Capstone family of companies.

56.     On information and belief, the decision to terminate Mr. Sterling's employment

was motivated by Mr. Solinsky wanting to avoid the image and what he assumed might be the

burden of having an individual battling cancer at the helm of his new company as it went to

market.

57.     At no time prior to this meeting had Mr. Solinsky ever suggested in any way that

he was thinking of moving in another direction or terminating Mr. Sterling's employment.

58.      In light of their longstanding work relationship and Mr. Solinsky's promises to

Mr. Sterling about different ventures in which Mr. Sterling would be involved, the tone and

message of the meeting were outrageously cruel.

59.     Within days of terminating Mr. Sterling's employment and his affiliation with

Capstone, Mr. Solinsky did what he had told Mr. Sterling he had planned to do: he announced

that he was starting up another defense industry venture.  But now, he did so without inviting Mr. Sterling to be part of it.

60.     In October of 2019, just weeks after Mr. Sterling's termination, based upon a nomination Mr. Sterling had caused to be made, the OnPoint product won an award as New Hampshire Product of the Year.

61.     Based on another nomination Mr. Sterling had sought and secured, the product was also nominated for the CES Innovation Award, which is the largest consumer electronics show in the world.  The OnPoint product was named CES Innovation Honoree.

62.     On October 24, 2019, less than two months after terminating Mr. Sterling, OnPoint put out a press releasing touting its "flagship product, the SpotOn Virtual Smart Fence, the first and only dog containment and tracking system that allows dog owners to take their dogs and virtual smart fence wherever they go…" publicizing the honor Mr. Sterling had positioned the organization to receives.  Mr. Solinsky was quoted in the article as the founder of OnPoint. He lauded the "OnPoint team" and their military expertise as being at the foundation of the product's success.  Mr. Sterling had led that team until weeks prior to this announcement being made.

63.     Predictably, given this attention, sales increased even more rapidly in light of that recognition as well.  Mr. Sterling was entirely cut off from enjoying any of the promised benefits of this start-up's success.

64.     On information and belief, the success the OnPoint product has achieved follows the business plan Mr. Sterling laid out with this team for the product roll out.

65.     At the end of 2020, Mr. Solinsky gave an interview to Forbes Magazine where he noted that when the product was brought to market in 2019, which was under the leadership of

Mr. Sterling, it "quickly found a market," reaching nearly $2 million in sales in its first year.  In 2020, the OnPoint product was on-pace to reach $7 million in sales, it was reported.

66.     In light of the profitability of the company, on information and belief, Mr. Sterling – had he continued his employment until the time of his passing – would have been entitled to significant bonus payments under his employment contract, which provided for them.

67.     Tragically, Mr. Sterling passed away on April 12, 2021.

68.     Mr. Sterling asked Ms. DiIorio-Sterling to press these claims in his final days, as he remained deeply distressed by the conduct of the Defendants.

69.     In this context, almost cruelly, Mr. Solinsky sent a condolence letter to Ms. DiIorio-Sterling, callously ignoring the impact of his actions on her and her husband even in his last moments.

70.     Ms. DiIorio-Sterling now brings these claims on behalf of her husband's estate, and on her own behalf as his widow and sole heir at law.

## COUNT I

### Violation of the Americans With Disabilities Act
### (Against the Corporate Defendants as an integrated/joint enterprise)

71.     Plaintiff restates and incorporates by reference paragraphs 1 - 70 of the Complaint, as specifically set forth herein.

72.     Mr. Sterling had met the administrative prerequisites to bringing an action in this Court against the Corporate Defendants as an Integrated/Joint Enterprise.

73.     As set forth above, Mr. Sterling was a person whose medical condition gave him protection under the Americans with Disabilities Act.

74.     The Corporate Defendants were aware of his status as a disabled person.

15

75.     As an integrated/joint enterprise, the Defendants harbored stereotyped notions of disabled persons battling cancer and took actions against Mr. Sterling, ultimately terminating his employment and denying him the long-term benefits and other positions promised.

76.     Mr. Sterling was harmed, and his Estate continues to be harmed, as a result.

## COUNT II

**Breach of Contract/Breach of the Covenant of Good Faith and Fair Dealing**
**(Against All Defendants)**

77.     Plaintiff restates and incorporates by reference paragraphs 1 - 76 of the Complaint, as specifically set forth herein.

78.     Mr. Sterling entered into an employment contract with Capstone through OnPoint. The contract was provided to him by a Capstone employee, with benefits through Capstone and support for the fledgling company through RPO.

79.     The contract provided for bonus payments for Mr. Sterling, which he was denied upon the termination of his employment as the OnPoint product launched.

80.     The Defendants breached their contractual obligations to Mr. Sterling, in terminating his employment and refusing to provide bonus payments to him or his surviving spouse.

81.     The Defendants' conduct was in violation of the covenant of good faith and fair dealing implicit in all contractual undertakings.

**WHEREFORE**, Plaintiff Christina DiIorio-Sterling, as nominated Personal Representative of the Estate of Scott R. Sterling, widow and sole beneficiary of the Estate of Scott R. Sterling, respectfully prays that this Court:

1.   Enter a judgment in Plaintiff's favor on all counts of this Complaint;

2.  Award her all damages she proves at trial to have suffered, including, *inter alia,* actual, compensatory, consequential, and special damages, back pay and loss of future benefits and long-term compensation, the loss of retirement and other benefits, harm to reputation, and damages for emotional distress, as well as multiple and punitive damages, with interest;

3.  Award her attorneys' fees, costs, with interest; and,

4.  Award her such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

Dated: June 28, 2021

**CHRISTINA STERLING,**

By Her Attorneys,

*/s/ Laura L. Carroll*
Laura L. Carroll (NH Bar No. 17444)
BURNS & LEVINSON LLP
125 High Street
Boston, MA 02110
Tel: (617) 345-3000
Fax: (617) 345-3299
Email: lcarroll@burnslev.com

Of Counsel:

Ellen J. Zucker (BBO #568051)
Beth Myers (BBO #676043)
BURNS & LEVINSON LLP
125 High Street
Boston, MA 02110
(Tel: (617) 345-3000
Fax: (617) 345-3299
Email: ezucker@burnslev.com
Email: bmyers@burnslev.com