UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Christina DiIorio-Sterling

      v.

Capstone Management, LLC, et al.

Civil No. 21-cv-569-LM
Opinion No. 2022 DNH 046 P

**O R D E R**

Plaintiff Christina DiIorio-Sterling, as representative of the estate of her late husband Scott Sterling, sues defendants Capstone Management, LLC; Rochester Precision Optics, LLC; and OnPoint Systems, LLC (collectively, the "Corporate Defendants"); and Kenneth Solinsky, the owner of Capstone. Plaintiff asserts claims for breach of contract and breach of the implied covenant of good faith and fair dealing[1] against all defendants, and a claim for violation of the Americans with Disabilities Act ("ADA") against the Corporate Defendants as a single, integrated enterprise. Solinsky, Capstone, and Rochester Precision separately move to dismiss each claim against them under Federal Rule of Civil Procedure 12(b)(6). OnPoint moves to dismiss the ADA claim, but not the breach of contract claim against it.

---

[1] Plaintiff asserts claims for breach of contract and breach of the implied covenant of good faith and fair dealing in the same count. For simplicity, the court refers to these claims simply as "breach of contract" claims.

While those motions to dismiss were pending, plaintiff moved to amend her complaint to add allegations to support her existing claims and to add a new claim for promissory estoppel against Solinsky and Capstone.  Doc. no. 43.[2]  All defendants object to plaintiff's motion to amend on the grounds that it would be futile because plaintiff's additional allegations do not save her original claims.  Solinsky and Capstone further argue that plaintiff's motion is futile because her new claim against them for promissory estoppel fails as a matter of law.

In short, there are five pending motions before the court: the four defendants' individual motions to dismiss and plaintiff's motion to amend.  For the following reasons, the court grants in part and denies in part Rochester Precision's motion to dismiss and denies the other defendants' motions to dismiss.  The court also grants in part and denies in part plaintiff's motion to amend.

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint must include allegations that would plausibly entitle the plaintiff to relief.  Bell Atl. v. Twombly, 550 U.S. 544, 599 (2007).  In evaluating a motion to dismiss, the court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 68 (1st Cir. 2000).  The court must determine whether the allegations are sufficient to support a reasonable

---

[2]  Plaintiff filed her present motion to amend (doc. no. 43) while a previous motion to amend (doc. no. 26) was still pending.  Plaintiff moved to withdraw her first motion to amend, and the court denied her first motion as moot.

inference that the defendant is liable to the plaintiff. Garcia-Catalan v. United States, 734 F.3d 1000, 1003 (1st Cir. 2013). In addition, although courts are generally prohibited from considering documents outside of the complaint on a motion to dismiss, courts may consider documents whose authenticity the parties do not dispute, official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint. Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

Where a defendant objects to a motion to amend a complaint on the grounds it would be futile, "the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion." Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996). In other words, the district court must determine whether the allegations in the amended complaint support the claims therein under the 12(b)(6) standard.

Defendants have challenged the claims in plaintiff's proposed amended complaint on Rule 12(b)(6) grounds. Specifically, defendants challenge both the original claims (breach of contract and violation of the ADA) and the new claim for promissory estoppel. Accordingly, the court will evaluate each of the challenged claims in the proposed amended complaint and dismiss any claim which does not survive review under the motion to dismiss standard.[3]

---

[3] Defendants' motions to dismiss relate to the factual allegations in the original complaint. However, in their objections to plaintiff's motion to amend, defendants do not challenge the propriety of plaintiff adding new allegations to support her original claims. Rather, defendants argue that adding these allegations would be futile because her claims still fail as a matter of law given defendants'

## BACKGROUND[4]

I.     <u>Scott Sterling's relationship with defendants</u>

In 2002, Sterling started working as a business developer for Insight Technology, Inc., a defense-industry business.  Having previously served in the United States military, Sterling appreciated working in the defense industry.  Eventually, Sterling became the vice-president of Insight Technology.  Defendant Kenneth Solinsky was the president and founder of Insight Technology.

In 2010, an unaffiliated company, L-3 Communications, bought Insight Technology.  After the acquisition, Solinsky became an executive for L-3 Communications.  Around this time, Solinsky hired Sterling as vice-president of business development.  While the two men were in these positions, Solinsky expressed an intention to work with Sterling on future corporate endeavors.

Sometime in 2014, Sterling left L-3 Communications and began working for Gentex Corporation, another defense-industry business, as the director of business development.  He subsequently became a vice president at Gentex.  In the fall of 2014, shortly after Sterling started working at Gentex, Solinsky spoke to Sterling about starting a new business venture in the defense industry.

---

arguments in the motions to dismiss.  Accordingly, there is no prejudice to defendants in evaluating the motions to dismiss based on the factual allegations in the proposed amended complaint.  Moreover, doing so will be more efficient for both the court and the parties because the court can resolve all pending motions without requiring the parties to refile any briefs.

[4] The court draws the factual summary from the proposed amended complaint, summarizes the facts in a light most favorable to plaintiff, and construes all reasonable inferences in her favor.

At some point prior to 2015, Solinsky started a new company—Capstone—which he incorporated as a New Hampshire limited liability company. Capstone's certificate of incorporation provides that its corporate purpose is "the operation and management of an office for family-controlled businesses." Doc. no. 43-1 ¶ 5. Capstone's registered agent is Rebecca Hunzeker, a Capstone employee. Solinsky and his wife are the owners of Capstone. In addition, Capstone wholly owns defendant Rochester Precision, another New Hampshire limited liability company that primarily manufactures optical lenses.

In the spring of 2015, Solinsky asked Sterling to join a new business that Solinsky was planning to incorporate as a subsidiary of Capstone. Solinsky represented that, as an incentive to joining the proposed business, Solinsky would grant Sterling a substantial equity stake in it. Solinsky told Sterling that the business would focus on defense-related technology and products. Based on these representations, Sterling agreed to work for the proposed business venture. In anticipation of assuming this new position, Sterling resigned from Gentex.

After Sterling quit Gentex, Solinsky disclosed that he could not enter the defense industry at that time, apparently due to a non-compete agreement with a prior employer. Nevertheless, Solinsky told Sterling that the two could work together on projects within Capstone or Capstone-owned businesses. Specifically, Solinsky planned to create a new company that would design and manufacture invisible dog fences. Solinsky asked Sterling to work for this proposed company.

Sterling was initially hesitant about Solinsky's offer because he had experience in the defense industry and was not familiar with consumer products. To persuade Sterling to work at this new business, Solinsky told Sterling that after launching the dog fence product, he planned to start a new defense-industry venture. Solinsky explained that if he worked on the dog fence, Sterling could later work for the new defense-industry venture. In addition, Solinsky told Sterling that he would be well compensated upon the launch of the dog fence and would receive a share in that company's profits.

At some point prior to April 16, 2015, Solinsky, through Capstone, incorporated a new company for the dog-fence venture: OnPoint.[5] Capstone wholly owns and controls OnPoint. OnPoint is a New Hampshire limited liability company and its business email address on file with the New Hampshire Secretary of State is a Capstone corporate email address. Hunzeker is also the registered agent for OnPoint.

On April 16, 2015, Solinsky sent Sterling an offer letter for the new position with OnPoint. Doc. no. 12-1.[6] The letter was on OnPoint letterhead, and Solinsky signed the document as OnPoint's manager. The letter stated that Sterling's

---

[5] OnPoint at one time had the name "Encore Technology, LLC." It is not clear from the record when the company changed its name to OnPoint.

[6] Solinsky attached the offer letter to his motion to dismiss. Although plaintiff did not attach this document to the complaint, the court takes notice of this document because plaintiff has not questioned its authenticity and she referred to it in the complaint to support the breach of contract claim. See Watterson, 987 F.2d at 3.

annual salary would be $250,000 and provided that "this salary [would be] guaranteed for three years from the date of employment unless such employment [was] terminated for cause as determined by" OnPoint's managers.  Id.  The letter also provided that Sterling would be eligible for an employee bonus program, which would be tied to OnPoint's profitability.  Finally, the letter stated that Sterling would be eligible for standard employee benefits and that Sterling would receive further details about the benefits after assuming employment.

Sterling signed the offer letter and accepted the position with OnPoint.  From May 2015 to September 2019, Sterling served as president of OnPoint.  In that role, he was responsible for the overall design, development, and market introduction of the dog fence.

While Sterling served as the president of OnPoint, employees at Solinsky's two other companies, Capstone and Rochester Precision, played an important role in establishing and administering OnPoint's policies and benefits, managing the company, and manufacturing the dog fence.  At the time Sterling joined OnPoint, Hunzeker emailed Sterling and explained that she handled all accounting and financial matters for Solinsky and his wife.  She also told Sterling that she would handle Sterling's payroll while he was president of OnPoint.  Although Hunzeker used a Capstone email address for this correspondence, in her signature she referred to herself as a "manager" of OnPoint.  Doc. no. 43-1 ¶ 33.

Soon after Sterling started at OnPoint, Hunzeker sent him an employee benefits brochure.  The benefits brochure was for employees at Rochester Precision.

Hunzeker informed Sterling that the benefits brochure was being updated to "reflect all of the entities" and that while at the time it only referenced Rochester Precision, the benefits would be the same at OnPoint. Id. ¶ 34. Hunzeker also gave Sterling Rochester Precision's purchasing policies to use at OnPoint, provided Sterling a non-disclosure agreement, and procured business cards for him. Hunzeker continued to play a role at OnPoint after Sterling started; she spent one day a week at the company, and Sterling consulted her on all financial matters.

Rochester Precision also played a role in OnPoint's operations. When Sterling sought to develop human resources policies for OnPoint employees, Rochester Precision specialists, presumably at Solinsky's direction, assisted him, drawing largely from Rochester Precision's own policies. Further, when OnPoint developed the dog fence, Solinsky tasked Rochester Precision with manufacturing it.

In December 2018, when Sterling had been with OnPoint for more than three years, he learned he had cancer. Four days after receiving the diagnosis, Sterling told Solinsky he intended to work throughout his treatment. Sterling returned to work full-time and did not take any significant time off. In June 2019, Sterling learned that to treat his cancer, he would need surgery. In August, Sterling's medical provider informed him that it had set a surgery date for September 20, 2019, and Sterling informed Solinsky of this date. On September 3, 2019, Solinsky fired Sterling.

The following day, September 4, Sterling received a letter affirming the termination. The letter was on OnPoint letterhead. Laurie Peath, a Human

Resources generalist at Rochester Precision, signed the letter, and directed Sterling to address all future questions about his benefits to her.  Sterling subsequently received tax information and withdrawal instructions regarding his "Capstone Management 401(k) plan," which included instructions to return distribution requests to Peath at a Rochester Precision email address.  Id. ¶ 64.  The tax notice also informed Sterling to notify Hunzeker of any changes to his address.  Hunzeker separately emailed Sterling to inform him he would receive a letter detailing payments for salary, unused vacation time, and benefits.

Several days after Solinsky terminated Sterling, Solinsky announced he was starting a new defense-industry venture.  He did not ask Sterling to join this business.  OnPoint earned significant profits from the dog fence.  Based on this success, plaintiff contends Sterling was entitled to significant bonus payments under his employment contract.  Sterling did not receive those payments.

II.      Sterling's employment discrimination charge[7]

On June 26, 2020, Sterling, with the assistance of counsel, filed a charge of discrimination against the three Corporate Defendants as a single, integrated

---

[7] In addition to the factual allegations in the amended complaint, the court relies on documents plaintiff attached to her objection to OnPoint's motion to dismiss based on the statute of limitations for ADA claims.  See doc. no. 22-1-11. The documents relate to Sterling's administrative charge against the Corporate Defendants.  See id.  Although these documents are outside the complaint, they are central to plaintiff's arguments about the timeliness of her action against OnPoint. Accordingly, the court will consider these documents in ruling on OnPoint's motion to dismiss.  See Watterson, 987 F.2d at 3.

enterprise with the Equal Employment Opportunity Commission ("EEOC").  Doc. no. 22-2.  Sterling listed the number of employees at the enterprise as 100.  The charge alleged disability discrimination.  The EEOC subsequently notified Sterling that it processed the charge as three separate charges, one against each of the Corporate Defendants.

After receiving Sterling's charge, the EEOC first investigated the allegations against OnPoint, which included requesting information on the number of employees at OnPoint.  On November 20, 2020, the EEOC sent a letter to Sterling stating that it lacked jurisdiction under the ADA over his charge against OnPoint because OnPoint had fewer than 15 employees, the minimum number of employees an employer requires to fall within the jurisdiction of the ADA.  The letter—known as a "right-to-sue letter"— informed Sterling that he could file a civil lawsuit against OnPoint under the ADA based on his charge, but that he had to do so within 90 days of the date he received the EEOC's letter.  Ninety days from November 20, 2020, was February 18, 2021.

On February 12, 2021, Sterling's counsel sent a letter to the EEOC requesting reconsideration of the decision to dismiss the charge against OnPoint on the grounds the three Corporate Defendants constituted a single enterprise.  On February 23, 2021, Sterling's counsel sent another letter to the EEOC laying out the argument that the Corporate Defendants were a single enterprise and providing supporting documents.

On March 30, 2021, the EEOC sent a letter to Sterling stating that the EEOC's "review of the file did not indicate a basis to reconsider the November 20, 2020, final determination."  Doc. no. 22-9.  The letter also stated that Sterling had 90 days from the date of the November 20 "right-to-sue" letter to file a civil action against OnPoint in federal court, and that the request for reconsideration did not extend or eliminate the deadline.

That same day, the EEOC sent two additional "right-to-sue" letters to Sterling, informing him that it was denying his charges against Capstone and Rochester Precision because he was not an employee of these companies.  Those letters stated that Sterling had 90 days from the date he received the letters to bring ADA actions against Capstone and Rochester Precision in federal court.

Sterling died from cancer on April 12, 2021.  On June 28, 2021, plaintiff filed this action on Sterling's behalf against Solinsky and the Corporate Defendants. This date was fewer than 90 days from March 30, 2021, the date Sterling received the right-to-sue letters for Capstone and Rochester Precision and the letter denying his request for reconsideration regarding OnPoint.  It was, however, more than 90 days after Sterling received the initial right-to-sue letter for OnPoint on November 20, 2020.


**DISCUSSION**

Defendants Solinsky, Capstone, and Rochester Precision separately move to dismiss each of the claims against them.  OnPoint moves to dismiss the ADA claim,

but does not move to dismiss the breach of contract claim against it.  The court evaluates the merits of the challenged claims below.

I.      Breach of contract

Plaintiff brings state-law claims for breach of contract against all defendants. Solinsky, Capstone, and Rochester Precision move to dismiss plaintiff's breach of contract claims on the grounds there was no contract between them and Sterling. Specifically, they contend that plaintiff pleads facts only showing that a written contract existed between Sterling and OnPoint.

A "breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 668 (2013).  In addition, in every New Hampshire contract, there is an implied covenant of good faith and fair dealing, the breach of which supports a cause of action.  Skinny Pancake-Hanover, LLC v. Crotix, 172 N.H. 372, 379 (2019).  As both claims are premised on a contractual relationship between the parties, the existence of that relationship is a prerequisite to both claims.  The essential elements of a contract are offer, acceptance, and consideration.  Chisholm v. Ultima Nashua Indus. Corp., 150 N.H. 141, 144 (2003). There must also be a meeting of the minds.  Id. at 145.  A plaintiff can accept an offer through either performance or the exchange of a mutual promise.  Id.

The court must decide if plaintiff's amended complaint sufficiently alleges that contracts exist between the following: (1) Solinsky and Sterling; (2) Capstone and Sterling; and (3) Rochester Precision and Sterling.

In short, plaintiff alleges that Solinsky told Sterling that he would hire Sterling to work at a Capstone defense firm (at some point in the future) and provide him an equity stake in OnPoint in exchange for Sterling's agreement to leave his job at Gentex Corporation.  Plaintiff also alleges that Sterling left his prior job and started working at OnPoint.  The question is whether Solinsky's alleged statements to Sterling are sufficient to bind Solinsky individually to a contract with Sterling, and to bind Capstone and Rochester Precision to separate contracts with Sterling.

With respect to Solinsky, plaintiff alleged sufficient facts to support all the elements of a contract between Solinsky and Sterling.  As to the first element, plaintiff alleged Solinsky offered Sterling employment at a defense firm and an equity stake in OnPoint if he agreed to work at OnPoint.  As to the second element, acceptance, plaintiff alleged Sterling both agreed to work at OnPoint and that he did so.  See Chisholm, 150 N.H. at 145.  With respect to the third element, consideration, plaintiff alleged each party gave something of value.  Finally, with respect to a meeting of the minds, plaintiff's allegations support an inference that Sterling believed Solinsky made these promises in exchange for Sterling's agreement to work at OnPoint.  Accordingly, there are sufficient allegations that Solinsky entered a contract with Sterling.

Plaintiff has also alleged sufficient facts to infer that Solinsky entered this same contract on behalf of Capstone as its agent and thus bound Capstone to the contract. To bind a principal to a contract, an agent must generally disclose that he is acting on behalf of the principal in entering the contract. See Dent v. Exeter Hosp., Inc., 155 N.H. 787, 792 (2007). If the agent does not expressly disclose the name of the principal, the principal may still be bound by the contract if the surrounding circumstances show the parties understood the agent to be acting on behalf of the principal. See Restatement (Third) of Agency, § 6.01, cmt. c, illus. 5 (2006). Here, plaintiff did not allege that Solinsky disclosed he was making the promises on behalf of Capstone. Nonetheless, construing the allegations in plaintiff's favor, they are sufficient to infer that the parties understood Solinsky was acting as Capstone's agent. Capstone had the ability to consummate the contract by hiring Sterling at a defense firm within the Capstone family and providing him an equity stake in OnPoint. Accordingly, there are sufficient allegations that there was a contractual relationship between Capstone and Sterling.

Solinsky and Capstone both contend that Solinsky's oral representations cannot support the existence of a contractual relationship because the offer letter from OnPoint to Sterling laid out the full terms of his employment. This would be the case if the parties intended the offer letter to be the full agreement between themselves. See Lapierre v. Cabral, 122 N.H. 301, 306 (1982) (holding that, absent indications the parties intended a writing to be the full agreement among themselves, the existence of a writing does not itself preclude additional terms to

the contract).  The offer letter did not appear to invalidate any other potential agreements between Sterling and Solinsky, Capstone, or OnPoint.  There is no integration clause in the offer letter, nor any other indication that the parties intended the offer letter to be the entire agreement between Sterling and defendants.  Therefore, the offer letter does not preclude a claim, at this early stage, that Solinsky entered an agreement with Sterling, on behalf of himself or Capstone, to hire Sterling at a defense firm and provide him an equity share in OnPoint in exchange for Sterling's agreement to work at OnPoint.  Id.

While there are sufficient allegations that Sterling entered contractual relationships with Solinsky and Capstone, plaintiff has failed to plausibly allege that a contract existed between Sterling and Rochester Precision.  There are insufficient allegations to infer that Solinsky acted on Rochester Precision's behalf in entering the contract (i.e., to hire Sterling at a defense firm and provide him a share in OnPoint) because there are no allegations to suggest that Rochester Precision could satisfy these terms.  Moreover, plaintiff does not allege that Rochester Precision, or an agent acting on its behalf, otherwise entered a contract with Sterling.  Accordingly, plaintiff cannot maintain her breach of contract claim against Rochester Precision.

In sum, the court grants Rochester Precision's motion to dismiss Count One but denies the motions to dismiss Count One as to Solinsky and Capstone.[8]

---

[8] In the alternative, plaintiff argues that she can hold Solinsky, Capstone, and Rochester Precision responsible for OnPoint's breach of contract by piercing OnPoint's corporate veil.  Piercing the corporate veil is not a separate cause of

II.     Promissory estoppel

In her amended complaint, plaintiff brings promissory estoppel claims against Solinsky and Capstone.  Plaintiff contends that Solinsky, either individually or on behalf of Capstone, promised to provide financial benefits and future employment to Sterling—including bonus compensation, an equity stake in OnPoint, and a position in a planned defense-related venture—if he agreed to work at OnPoint.  Solinsky and Capstone argue that plaintiff's promissory estoppel claims fail as a matter of law because promissory estoppel is appropriate only in the absence of an express agreement, and plaintiff herself alleges that Sterling entered a contract governing the terms of his employment with OnPoint.

Promissory estoppel is an equitable remedy to enforce a promise from the defendant to the plaintiff.  Great Lakes Aircraft Co. v. City of Claremont, 135 N.H. 270, 290 (1992).  It applies where a defendant makes a gratuitous promise to the plaintiff, the plaintiff reasonably relies on the promises, and the plaintiff changes her position because of that reliance.  Id.  A change in position can include both taking action or not taking action in reliance upon a promise.  Restatement (Second) of Contracts § 90 (1981).  A change in position can also include entering a contract with a third party.  Id., cmt. f, illus. 18 (explaining that parent who promises

---

action, but an equitable means of holding the owners of corporations liable for a corporation's obligations to avoid fraudulent or unjust results.  Terren v. Butler, 134 N.H. 635, 639 (1991).  Determining whether it is appropriate to pierce the corporate veil is a fact-intensive inquiry not well-suited for resolution at this early stage of the litigation.

property to his child in anticipation of the child's marriage may be bound by that promise if the child relies on it in entering marriage).  In essence, promissory estoppel allows plaintiffs to enforce certain promises outside of a contractual agreement.  For this reason, and with limited exceptions, promissory estoppel is only appropriate in the absence of an express contractual agreement between the parties.  Great Lakes, 135 N.H. at 290.

Plaintiff has pleaded sufficient facts to support claims for promissory estoppel against Solinsky and Capstone.  Specifically, she argues that Solinsky, either individually or on behalf of Capstone, made representations to induce Sterling to work for OnPoint and that Sterling relied on those representations in agreeing to work for OnPoint.  As the court has previously noted, there are sufficient allegations that Solinsky made these representations in either his personal capacity or as the owner of Capstone.  See supra at 13-15; cf. Myers v. Alutiiq Intern. Solutions, LLC, 811 F. Supp. 2d 261, 273 (D.D.C. 2011).

Much like the basic contract claim, there are sufficient allegations that Solinsky knew his representations would induce Sterling to work for OnPoint and that Sterling reasonably believed he would receive these benefits if he agreed to work for the company.  Finally, it is reasonable to infer that Sterling relied on these promises in accepting the job because they were substantial incentives that would likely influence a person's employment decisions.  Therefore, plaintiff has stated a plausible claim for promissory estoppel against both defendants.  See Great Lakes, 135 N.H. at 290.

Defendants argue that plaintiff's promissory estoppel claim fails because plaintiff has also alleged there was a contract between Sterling and OnPoint governing Sterling's employment.  A promissory estoppel claim is unavailable where there is an express agreement between the parties governing the transaction at issue.  Id.  For this reason, the existence of a contract between Sterling and OnPoint would likely preclude a promissory estoppel claim against OnPoint related to the contractual relationship.  A contract between Sterling and OnPoint would not, however, necessarily preclude promissory estoppel claims against Solinsky and Rochester Precision based on representations they made in their individual capacities because they were not parties to the contract.  See Restatement (Third) of Agency § 6.01, cmt. b; Restatement (Second) of Contracts § 90, cmt. f, illus. 18.

Finally, the fact that plaintiff alleges the existence of contractual relationships between Sterling and both Solinsky and Capstone does not preclude her promissory estoppel claims.  A plaintiff may plead inconsistent theories of recovery in the alternative.  Lass v. Bank of Am., N.A., 695 F.3d 129, 140 (1st Cir. 2012).

For these reasons, the promissory estoppel claims against Solinsky and Capstone survive review.


III.    Americans with Disabilities Act

The ADA prohibits, among other activities, employers from discriminating against their employees due to disability status.  See 42 U.S.C. §§ 12111-12.  In her

complaint, plaintiff alleges the three Corporate Defendants, acting as a single enterprise, violated the ADA by discriminating against Sterling because he had cancer.  Each of the Corporate Defendants moves separately to dismiss the claim. Capstone and Rochester Precision argue that they cannot be held liable for discrimination under the ADA because they were not Sterling's employer.  For its part, OnPoint argues that the ADA claim against it is barred by the applicable statute of limitations.  The court addresses both arguments below.

### A.    Single enterprise

Capstone and Rochester Precision both move to dismiss on the grounds that they were not Sterling's employers and that they therefore cannot be held liable for employment discrimination against him.  In response, plaintiff maintains that each of the Corporate Defendants is liable for the discrimination against Sterling because they all acted as part of a single enterprise.

In general, an entity is only liable for employment discrimination under the ADA if it was the complainant's employer.  See 42 U.S.C. § 12111.  However, under the ADA and several other federal employment statutes, companies that are not technically the complainant's employer may be held liable as an employer under the "single enterprise" or "single employer" theory.  See Burnett v. Ocean Props., Ltd., 987 F.3d 57, 65 (1st Cir. 2021).  Nominally separate entities can be considered a single enterprise if they are so sufficiently interrelated that they effectively operate as a single employer.  Id.

If a single enterprise exists, each of the entities within the larger enterprise is jointly liable to the plaintiff.  See Arculeo v. On-Site Sales & Mktg., LLC, 425 F.3d 193, 198 (2d Cir. 2005).  Single-integrated enterprises can include parent and wholly-owned subsidiary corporations or separate corporations that operate under common ownership and management.  Id.

In determining whether a single enterprise exists, courts consider four factors: (1) centralized control over labor relations, (2) interrelation between corporations, (3) common management, and (4) common ownership.  Burnett, 987 F.3d at 65.  None of these factors is dispositive in establishing a single enterprise. Id.  Rather, courts must apply the test flexibly, placing special emphasis on the first factor, the control of employment decisions.  Id.; see also Romano v. U-Haul Int'l, 233 F.3d 655, 666 (1st Cir. 2000).  Whether several entities constitute a single enterprise is a question of fact for the jury.  See Romano, 233 F.3d at 666-67.

Plaintiff has alleged sufficient facts to state a plausible claim that the Corporate Defendants constitute a single enterprise.  To satisfy the first (and most important) factor, a "parent must control the day-to-day employment decisions of the subsidiary."  Id. at 666 (quotations omitted).  Here, Solinsky either owned or controlled all three Corporate Defendants, and appeared to have ultimate authority over employment decisions at all three.  For example, Solinsky, as the owner of Capstone, terminated Sterling as president of OnPoint.  In addition, one can reasonably infer from plaintiff's allegations that Capstone established personnel and benefits policies that were applicable at all three Corporate Defendants.

Indeed, Sterling, an employee of OnPoint, was enrolled in Capstone's 401(k) plan. Considered together, these allegations are sufficient to support a finding that Capstone exercised centralized control of labor at all three Corporate Defendants. See Torres-Negron v. Merck & Co., Inc., 488 F.3d 34, 43 (1st Cir. 2007) (holding that first factor weighed in favor of finding of a single enterprise where parent company established personnel policies applicable to all of its subsidiaries and retained the power to terminate an employee at a subsidiary); Burnett, 987 F.3d at 66 (holding that employee of subsidiary's participation in parent's 401(k) plan was evidence of centralized control of labor relations).  The first factor therefore weighs in favor of a finding that they constitute a single enterprise.

The second factor, the interrelation of operations, "evaluates whether [the corporations] shared employees, services, records, office space, equipment, commingled finances, and handling by the parent of subsidiary tasks such as payroll, books, and tax returns."  Burnett, 987 F.3d at 66 (quotations omitted). Plaintiff alleges that Rebecca Hunzeker, a Capstone employee, provided a significant number of services to OnPoint and the Corporate Defendants.  While Hunzeker referred to herself as a manager at OnPoint, she used a Capstone corporate email address to correspond with Sterling.  Hunzeker onboarded Sterling as the president of OnPoint, informed him that she handled all financial and accounting matters for Solinsky and his wife, provided financial oversight at OnPoint, and handled Sterling's payroll.  Hunzeker gave Sterling Rochester Precision's purchasing policies to use at OnPoint.  She also provided Sterling an

employee benefits brochure for Rochester Precision employees, and expressly noted that the benefits program was standardized across the Capstone family of businesses.

Further, plaintiff alleges that Rochester Precision employees, presumably at the direction of Capstone and Solinsky, developed OnPoint's human resources policies, largely basing them off Rochester Precision's existing policies.  After losing his position, Sterling received a letter from Laurie Peath, an employee of Rochester Precision, which informed him to address all future questions about his benefits to her at a Rochester Precision email address and to notify Hunzeker of any changes to his mailing address.  In addition, Rochester Precision manufactured the dog fence for OnPoint.  Taken together, these allegations demonstrate significant interrelationship between Capstone and its subsidiaries.  See Burnett, 987 F.3d at 66-67 (finding sufficient interrelationship where entities shared employees and corporate documents, employees used common email addresses, and the parent provided payroll, corporate, and legal services for the subsidiary).  Thus, the second factor supports a finding of a single enterprise.

The third factor, common management, "examines whether the same individuals manage or supervise the different entities or whether the entities have common officers and boards of directors."  Id. at 67 (quotations omitted).  From the record, it appears that in his position as owner of Capstone, Solinsky played a management role in OnPoint.  For example, Sterling reported his cancer diagnosis to Solinsky and informed him of his capacity to work while seeking treatment, and

Solinsky made the decision to terminate Sterling.  In addition, Hunzeker, a Capstone employee, played an important management and supervisory role at OnPoint, as Sterling discussed all OnPoint financial matters with her.  This factor likewise supports a finding of a single enterprise.

The fourth factor, common ownership, "looks at whether one company owns the majority or all shares of the other and if the entities share common officers or directors."  Id.  Solinsky, together with his spouse, owns Capstone, and Capstone in turn wholly owns OnPoint and Rochester Precision.  This fourth factor also weighs in favor of a finding a single enterprise.

Viewing the facts in a light most favorable to plaintiff, the amended complaint alleges sufficient facts to support her claim that the Corporate Defendants acted as a single, integrated enterprise.  The court therefore denies defendants' request to dismiss the ADA claim against Capstone and Rochester Precision on the grounds they were not Sterling's employers.

B.  Statute of limitations

OnPoint moves to dismiss plaintiff's ADA claim against it on the ground that the claim is barred by the statute of limitations.[9]  "Claims of employment

_____

[9] OnPoint moves to dismiss "the claim" against it.  However, there is no stand-alone ADA claim against OnPoint in this case.  The EEOC found that OnPoint does not have 15 employees—the minimum number it must have to be sued under the ADA.  See 42 U.S.C. § 12111(5)(A).  Plaintiff does not dispute this fact.  Thus, although OnPoint appears to refer to an ADA claim against it—OnPoint does not meet the minimum requirements for plaintiff to bring a stand-alone claim against it.  OnPoint's argument for dismissal is perhaps better understood as an

discrimination . . . under the ADA are subject to the procedural requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5 to -9." Rivera-Diaz v. Humana Ins. of Puerto Rico, Inc., 748 F.3d 387, 389 (1st Cir. 2014) (citing 42 U.S.C. § 12117(a)).  Under this procedure, individuals cannot file civil claims under the ADA until they exhaust their administrative remedies.  Id.

To exhaust administrative remedies, an individual must start by filing a charge of discrimination with the EEOC.  Upon receiving a complaint of employment discrimination, the EEOC must notify the employer and investigate the charge.  42 U.S.C. § 2000e-5(b).  If after conducting this investigation, the EEOC determines that the charge fails to state a claim for relief, it must dismiss the charge and send the individual a right-to-sue letter explaining the EEOC's decision and notifying the individual of the right to sue the employer.  See id.; 42 U.S.C. § 2000e-5(f)(1); 29 C.F.R. §§ 1601.18-19.  After the individual receives that letter, they may bring a civil action against the employer.  42 U.S.C. § 2000e-5(f)(1). However, absent extenuating circumstances, the individual cannot bring an action more than 90 days after they receive a right-to-sue letter from the EEOC.  Id.; see also Rivera-Diaz, 748 F.3d at 390.

In this case, OnPoint argues that plaintiff's claim is untimely because she failed to file suit against it within 90 days of the date the EEOC issued the right-to-

---

argument that it should be dismissed from the case as a defendant.  That is, that plaintiff's ability to hold OnPoint jointly and severally liable on the ADA claim (against the Corporate Defendants) was extinguished when she failed to file a timely claim against it in this court.  For the sake of simplicity, however, the court will also use the word "claim" throughout this analysis.

sue letter dismissing the charge against OnPoint on November 20, 2020.  Plaintiff

argues that her claim against OnPoint is not barred by the statute of limitations

because she has alleged OnPoint is part of single enterprise with the other

Corporate Defendants, there were charges pending against Capstone and Rochester

Precision until March 30, 2021, and she filed her claim within 90 days of the date

the EEOC dismissed these charges in March 2021.

The court is not aware of any caselaw that addresses the unique

circumstances in this case: where a plaintiff brings a claim against several entities

as part of a purported single enterprise and the statute of limitations could bar a

claim against one of the entities.  Nor have the parties pointed the court to any

cases that either address this issue or analyze factual circumstances analogous to

this case.

Plaintiff has made a colorable argument that her claim against OnPoint is

timely.  While there is no case that deals with this precise issue, there are cases

dealing with somewhat analogous situations.  For example, there is a procedural

rule requiring a plaintiff to include each entity in its EEOC claim prior to naming it

in a lawsuit under the ADA.  42 U.S.C. § 2000e-5(e).  This rule serves to provide

notice to employers of charges against them, thereby allowing them to them to

participate in the conciliation process before the EEOC and avoiding unnecessary

litigation.  EEOC v. Simbaki, Ltd., 767 F.3d 475, 482-83 (5th Cir. 2014), as revised

(Sept. 18, 2014).  One exception to this requirement is called the "identity of

interests exception."  See id. at 482.  This exception permits an action to proceed

against an unnamed party where it shares such substantially similar interests as a charged defendant that its interests were effectively represented at the EEOC.  Id.

Given the necessarily close relationship between the entities in a single enterprise, it is not surprising that courts routinely apply the exception to uncharged entities in a single enterprise.  See Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1185 (10th Cir. 1999); Melendez-Fernandez v. Special Care Pharmacy Servs., Inc., N. 11-1662, 2012 WL 48113528, at *7 (D.P.R. Oct. 10, 2012); see also U.S. EEOC v. Sol Mexican Grill, LLC, 415 F. Supp. 3d 5, 19 (D.D.C. 2019); EEOC v. Care Centers Mgmt. Consulting, Inc., 942 F. Supp. 2d 771, 777 (E.D. Tenn. 2013); Quasius v. Schwan Food Co., No. CIV. 08-575 (JNEJJG), 2008 WL 4933764, at *6 (D. Minn. Nov. 14, 2008); Dunn v. Tutera Grp., 181 F.R.D. 653, 659 (D. Kan. 1998).  Accordingly, even if plaintiff had not brought a charge against OnPoint in the first place, her plausible allegations of a single enterprise would likely be sufficient at this stage to allow her ADA claim against OnPoint to move forward based on the charges against the other Corporate Defendants.

Although not precisely on point, a further line of cases provides persuasive authority that the November 20, 2020 letter dismissing the charge against OnPoint does not preclude plaintiff from seeking to hold OnPoint liable in this case. Plaintiffs are required to file lawsuits based on a charge within 90 days of receiving a right-to-sue letter for that charge.  Rivera-Diaz, 748 F.3d at 390.  To prevent plaintiffs from skirting the statute of limitations by simply filing new charges with the same allegations after the statute has lapsed, courts ordinarily preclude

plaintiffs from including allegations in a civil lawsuit that were raised in a stale charge.  See id. at 391; Soso Liang Lo v. Pan Am. World Airways, Inc., 787 F.2d 827, 828 (2d Cir. 1986).

Courts have noted, however, that this concern about avoiding the statute of limitations is not applicable where a plaintiff files multiple charges with similar allegations before the EEOC acts on any of the charges.  See Babcock v. Frank, 729 F. Supp. 279, 285 (S.D.N.Y. 1990).  In these circumstances, the EEOC may process the charges in a piecemeal manner, resulting in some of the related charges becoming stale before the EEOC processes all of them.  See id.  When plaintiffs bring timely lawsuits based on one of the related charges, many courts have not precluded plaintiffs from including allegations raised in the stale charges as long as they were reasonably related to allegations in the timely charges.  See Brown v. Cont'l Can Co., 765 F.2d 810, 813 (9th Cir. 1985); Clark v. Com. of Pa., 885 F. Supp. 694, 710-11 (E.D. Pa. 1995); Babcock, 729 F. Supp. at 285; but see Brown v. Walt Disney World Co., 805 F. Supp. 1554, 1559 (M.D. Fla. 1992) (precluding plaintiff from raising any allegations in her Title VII lawsuit that she first raised in a stale EEOC charge, and noting that the allegations in the stale charge were not preserved by the existence of related charges pending before the EEOC); Ivy v. Meridian Coca-Cola Bottling Co., 108 F.R.D. 118, 126 (S.D. Miss. 1985) (same).

Although neither party has robustly briefed the question, this caselaw provides enough support for the court to deny OnPoint's motion to dismiss the claim

on timeliness grounds. Accordingly, at this early stage of the proceedings, the court will allow plaintiff's ADA claim to include OnPoint.

## CONCLUSION

For the foregoing reasons, the court grants Rochester Precision's motion to dismiss (doc. no. 20) the breach of contract claim against it and denies plaintiff's motion to amend (doc. no. 43) to the extent her proposed amended complaint includes that claim. The court otherwise denies defendants' motions to dismiss (doc. nos. 12, 13, 19, 20) and grants plaintiff's motion to amend (doc. no. 43). Plaintiff will refile an amended complaint consistent with this order within 30 days of the notice of decision accompanying this order.

SO ORDERED.

Landya McCafferty
United States District Judge

March 31, 2022

cc: Counsel of Record